IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| **S.C. JOHNSON & SON, INC.,** | |
| Plaintiff, | |
| | Case No: 2:10-cv-00681 |
| | **JURY TRIAL DEMANDED** |
| vs. | |
| **TRANSPORT CORPORATION OF AMERICA, INC.**<br>1715 Yankee Doodle Road<br>Eagan, MN 55121, | |
| **STEVENS TRANSPORT, INC.**<br>9757 Military Parkway<br>Dallas, TX 75227, | |
| **GRAHAM KENT PHARR,**<br>14 Glenbrook Drive<br>Prospect Heights, IL 60070, | |
| Defendants. | |

## AMENDED COMPLAINT

Plaintiff S.C. Johnson & Son, Inc. ("SC Johnson"), for its complaint against Transport Corporation of America, Inc. ("TA"); Stevens Transport ("Stevens"); and Graham Kent Pharr ("Pharr") (collectively, "Defendants"), alleges as follows:

1. This complaint is brought by SC Johnson to recover damages caused by a bribery and kickback scheme orchestrated by Defendants, Milton E. Morris ("Morris"), and others.

2. Morris was the Director of SC Johnson's Transportation Department from 1988 through October 2004. In that position, he was responsible for managing the department that

arranges the terms for and coordinates the shipment of SC Johnson's products across the United States and internationally, with a budget of over $90 million annually.

3. In early 2004, SC Johnson began to investigate the operations of the Transportation Department under Morris's direction. After an investigation, SC Johnson terminated Morris with cause on October 18, 2004.

4. SC Johnson also filed the lawsuit *S.C. Johnson & Son, Inc., v. Milton E. Morris, et al.*, No. 04-CV-1873, against Morris on October 18, 2004. Based on its continuing investigation, on December 22, 2004, SC Johnson amended its complaint to add additional defendants: Thomas H. Buske, Buske Lines, Inc., Buske Intermodal, LLC, Tom Russell, Transportation Associates, Inc. d/b/a/ JMP Company, and JMP Intermodal, Inc. On August 8, 2005, SC Johnson amended its complaint, again based on its continuing investigation, to add the following defendants: Katherine Scheller, All Modes Logistics, Inc., Bay Darnell, David Eggleston, Vantraxx, Inc., and Pete O'Malley.

5. The case against Morris, Scheller, Buske, Buske Lines, Buske Intermodal, Russell, JMP Company and JMP Intermodal was tried in Circuit Court of Racine County, Wisconsin in January and February 2008. Final judgment in the amount of $203.8 million against these defendants was entered June 2, 2008. The case against Darnell, Eggleston and All Modes was tried in May and June 2009. Vantraxx and O'Malley entered into a confidential settlement agreement with SC Johnson.

6. Morris personally received thousands of dollars or more in money, goods, travel, entertainment, and services from Stevens and TA, shipping carriers that did business with SC Johnson, and Pharr, an agent of another carrier Far Side Trucking, Inc. ("Far Side"). Pharr and other agents of agents of Stevens and TA also traveled, golfed, and/or gambled with Morris. In

exchange, Morris provided favorable treatment to Defendants and Far Side, including, but not limited to, causing SC Johnson to pay Defendants and Far Side transportation rates in excess of rates available on the open market; to pay Defendants charges invoiced at levels well above industry standards; and, in some cases, to award shipping business to Defendants and Far Side. SC Johnson has overpaid Defendants and Far Side by at least tens of millions of dollars as a result of Defendants' illegal and fraudulent schemes.

7. Defendants and Morris also schemed with Scheller. In approximately June 1999, Scheller joined the Transportation Department in the position of Import/Export Services Manager, reporting directly to Morris. Scheller, who had an ongoing and longstanding personal relationship with Morris, often accompanied Morris on business trips and visits with some of the Defendants even though there was no business purpose for her travel. From her participation, Scheller received thousands of dollars in money, goods, travel, entertainment, and services.

8. Prior to his termination from SC Johnson in October 2004, Morris arranged for Scheller to assume his role as Director of Transportation. By ensuring Scheller's succession as Director of Transportation, Morris and Scheller planned to continue with the long- running scheme after Morris's retirement.

## PARTIES

9. SC Johnson is a Wisconsin corporation with its principal place of business in the City and County of Racine, Wisconsin.

10. TA is a Minnesota corporation with its principal place of business in Eagan, Minnesota. TA, a shipping company, did business with SC Johnson, including business in Wisconsin.

11. Stevens is a Texas corporation with its principal place of business in Dallas, Texas. Stevens, a shipping company, did business with SC Johnson, including business in Wisconsin.

12. Pharr is the owner of Far Side and a citizen of Illinois, residing in Prospect Heights, Illinois.

## VENUE AND JURISDICTION

13. Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this matter because there is complete diversity between the parties, which are domiciled in different states, and the amount in controversy is in excess of $75,000, exclusive of interest, fees and costs.

14. Pursuant to 28 U.S.C. § 1391, venue is proper in the United States District Court for the Eastern District of Wisconsin because a substantial part of the events giving rise to SC Johnson's claims occurred within this district.

## FACTUAL ALLEGATIONS

15. SC Johnson, based in Racine, Wisconsin, is a leading manufacturer of domestic and personal care products. The company was founded in 1886 and five generations later is privately owned by the family of its founder. SC Johnson markets its products throughout the United States and in over one hundred countries worldwide.

16. As a leading manufacturer of household products, SC Johnson must be able to ship goods efficiently from its manufacturing facilities to distribution centers and retailers across the United States and throughout the world. SC Johnson's Transportation Department is responsible for ensuring that SC Johnson's products arrive at their destinations efficiently and at competitive rates.

17. Morris was Director of SC Johnson's Transportation Department from 1988 through October 2004. During that time, Morris was responsible for evaluating and selecting carriers to

4

transport goods for SC Johnson, negotiating contracts and rates with carriers, and authorizing payment to carriers for services rendered and other accessorial charges (*e.g.,* fuel surcharges, lumper fees, detention fees, and trailer rental). During his employment, Morris was advised, and understood, that his duty was to obtain transportation services at competitive rates and to use SC Johnson's carriers in a cost effective and efficient manner.

18. Since 1999, Scheller assisted Morris in carrying out his duties as Director of Transportation. Scheller similarly was advised, and understood, that her duty was to obtain transportation services at competitive rates and to use SC Johnson's carriers in a cost effective and efficient manner.

19. As a result of an investigation, by fall 2004, SC Johnson had uncovered a potential ongoing pattern of corruption and racketeering among Morris, Scheller, and certain carriers. In approximately spring 2005, SC Johnson's investigation revealed that Defendants were involved in, and had benefited from, the conspiracy. Defendants provided Morris with, among other items of value, cash, gambling funds, gifts, travel, entertainment, and/or personal services. In return, Morris used his authority within SC Johnson to give favorable treatment to Defendants. Morris, with assistance from Scheller, caused SC Johnson to pay the Defendants transportation rates in excess of rates available on the open market; to pay Defendants charges invoiced at levels well above industry standards; and to award business to Defendants.

20. While many of the exact details of Defendants' schemes are peculiarly within Defendants' knowledge and are the subject of an ongoing investigation, SC Johnson thus far can allege the following details of the scheme.

## I. DEFENDANTS' BRIBES TO MORRIS

### A. Gambling

21. For at least the last several years of his tenure at SC Johnson, Morris engaged in gambling activities with one or more employees and/or officers of Defendants and Pharr ("Carriers' Agents"). The Carriers' Agents understood that gambling and losing money to Morris was instrumental in gaining and keeping SC Johnson business.

22. Morris and some of the Carriers' Agents gambled together at casinos and poker games.

23. Pharr and Mike Wadkins, a Far Side employee, participated in regular Wednesday night poker games at the Kenosha Country Club with Morris. Those games provided an opportunity to offer Morris bribes and/or to pay Morris bribes in the form of "gambling losses."

24. In April 2004, Morris traveled to Biloxi, Mississippi on a gambling trip and his expenses were paid by a carrier. Pharr and Wadkins travelled with Morris and others, including representatives of other carriers, on that trip. There, Morris, Pharr, Wadkins and others gambled at the Palace Casino, which was owned by the owner of another carrier. The purpose of this and other trips was to convey cash and other goods and personal services to Morris and to develop a pretext for Morris's large inflow of cash.

25. Defendants have also bribed and gambled with Morris through frequently occurring golf games, paying thousands of dollars in "gambling losses."

26. On at least one occasion in 2004, Todd Aaron of Stevens gambled with Morris on the golf course with the wager being a rate increase from SC Johnson.

### B. Travel and Entertainment

27. Defendants also associated with Morris through travel and entertainment, which provided opportunities for Defendants to meet with Morris and provide bribes to Morris.

28. Travel was often under the guise of supposed carrier review meetings, at which very little if any legitimate business was conducted. During these meetings, which often lasted several days, Defendants paid a substantial portion of Morris's expenses, including airfare, lodging, meals, and golf. These meetings also provided an opportunity for Defendants to bribe Morris.

29. Records received pursuant to subpoena from Stevens indicate that Stevens paid tens of thousands of dollars in lodging, meals, and entertainment for Morris during carrier review meetings in Dallas, Wisconsin, and Mexico. By way of example:

   a. In May 2000, Stevens paid in excess of $2,300 in lodging, meals and golf expenses for Morris to stay at the Four Seasons Dallas.

   b. At a carrier review in July 2001, Stevens paid approximately $3,400 on golf, dinner and lodging expenses for Morris at the American Club in Kohler, Wisconsin.

   c. In May 2002, Stevens paid approximately $4,300 in golf, meals, and accommodations for Morris and Scheller at the American Club in Kohler, Wisconsin.

   d. Stevens also spent more than $2,000 at a carrier review meeting in Mexico City, Mexico in September 2002.

   e. In May 2003, Stevens paid more than $3,100 at a carrier review meeting at the America Club in Kohler, Wisconsin.

30. Stevens' executive Todd Aaron testified under oath that Stevens did not entertain any other customers as he did Morris, did not do business reviews comparable to the business reviews held for SC Johnson, and that "we've never gone on any retreats" as he did with Morris.

31. Upon information and belief, during at least some trips Aaron paid for prostitutes for Morris.

32. Other travel provided and paid for by Stevens included airfare and lodging in Dallas for Morris and Scheller to attend Aaron's daughter's Bat Mitzvah celebration.

7

33. TA also provided thousands of dollars in lodging, meals, and entertainment for Morris during supposed carrier review meetings and other outings:

   f. In May 2002, TA paid thousands of dollars for a three-day carrier review weekend in Kohler, Wisconsin. The attendees, which included Morris and Scheller, spent only an hour on actual carrier review, and spent the remainder of the weekend on golfing, gambling and other entertainment. TA paid for the Presidential Suite for Morris in Kohler.

   g. Richard Lane, former TA executive, testified under oath that the Kohler trip was not typical for the industry because of the "expense and the extravagance" and that "it was over the top."

   h. TA also entertained Morris on at least two occasions in Tucson, Arizona.

**C. Cash Bribes**

34. SC Johnson also believes that Morris has received cash payments from Defendants, which likely have been substantial and systematic over the years. These cash payments, along with payments provided by others who conspired with Morris, have allowed Morris to make cash deposits of over $1.2 million (above his SC Johnson compensation) into various accounts. Morris also retained large amounts of cash in safety deposit boxes.

35. These payments constituted bribes to Morris.

36. On June 28, 1999, Stevens wrote a check to Morris in the amount of $1,681, ostensibly for a charity sponsorship.

37. Todd Aaron paid cash to or cash expenses for Morris in the amount of $1250 to Morris while Morris was visiting Dallas in May 2000. Todd Aaron then created a phony receipt from the Four Seasons in the amount of $1250 to conceal the bribe as a legitimate business expense.

38. Far Side and/or Pharr's wife, Jean Pharr, wrote ten separate checks worth over $30,000 directly to Morris between August 29, 2002 and August 31, 2004.

39. Far Side withdrew over $1.2 million in cash from the business between August 2001 and October 2004. Upon information and belief, at least some of this case was provided to Morris as a bribe.

40. When asked during a deposition whether he ever gave money or anything of value to Morris, Pharr invoked his Fifth Amendment right against self-incrimination.

41. Other cash payments were made in the guise of paying gambling winnings.

42. Upon information and belief, TA made significant payments to Morris through Tom Russell, owner of other transportation vendors and a conspirator of Morris's. Between 2001 and 2004, TA issued dozens of checks totaling nearly $50,000 to entities owned by Russell. There was no legitimate business reason for TA to make payments to a potential competitor. While these payments were ostensibly for a lease on Russell's lot and for shuttling work by Russell's company, the two former TA executives (Kent Rigdon and Rick Lane) who would have had knowledge of any such lease and shuttle work both testified under oath they had no knowledge of any such arrangement. Upon information and belief, Russell then caused these payments to be passed to Morris.

**D.  Other Bribes**

43. In October 2000, Morris approached the chief account executive of TA and told him that if he hired Marsha Colburn, Morris would raise TA's rates and give TA more business.

44. An October 16, 2000 internal memorandum documented that Morris "committed to increasing our load count and revenue" if TA hired Colburn.

45. Colburn was a very close friend of Morris and was also friends with Scheller.

46. A few weeks later, TA awarded Colburn the position of Regional Marketing Manager at a salary dictated by Morris, even though the position was not needed.

47. TA received a rate increase from SC Johnson around the time that it decided to hire Colburn.

48. The cost of Colburn's salary to TA was covered by a rate increase from SC Johnson.

49. An internal TA memorandum recognized that "whoever makes the effort [to hire Colburn] will be rewarded immediately."

## II. FAVORABLE TREATMENT PROVIDED BY MORRIS TO DEFENDANTS

50. In exchange for the bribes received from Defendants, Morris provided favorable treatment to Defendants and Far Side, including, but not limited to, causing SC Johnson to pay Defendants and Far Side transportation rates in excess of rates available on the open market; to pay Defendants and Far Side charges invoiced at levels well above industry standards; and, in some cases, to award an increasing amount of its shipping business to Defendants and Far Side.

51. Morris awarded the Defendants and Far Side additional business despite the fact that the rates and quality of service of Defendants and Far Side were not competitive with other SC Johnson suppliers or the industry as a whole.

52. Stevens' revenues from SC Johnson increased from approximately $5.13 million in 1997 to over $9 million in 2004.

53. Stevens charged above-market rates to SC Johnson.

54. Stevens charged SC Johnson for use of refrigerated trailers, which had less capacity to carry SC Johnson's products and were more expensive, when refrigerated trailers were not necessary, including but not limited to on routes through the southern United States and Mexico that Stevens serviced.

55. Stevens was awarded routes to Canada. There was no legitimate business reason for Stevens, a Texas-based company, to service Canada. On information and belief, Stevens'

rates to Canada were significantly higher than SC Johnson could have otherwise obtained. SC Johnson realized millions of dollars in savings when it switched carriers to Canada in 2005.

56. Stevens was also awarded routes to Mexico. On information and belief, Stevens' rates to Mexico were significantly higher than SC Johnson could have otherwise obtained. SC Johnson realized millions of dollars in savings when it switched carriers to Mexico in 2005.

57. Stevens was awarded over-the-road business on other routes where intermodal should have been used.

58. TA's revenues from SC Johnson increased from approximately $2.42 million in 1997, to $20.9 million in 2001. In 2004, revenue was $13.1 million.

59. TA charged above-market rates to SC Johnson.

60. TA was awarded routes to Canada. On information and belief, TA's were significantly higher than SC Johnson could have otherwise obtained. SC Johnson realized millions of dollars in savings when it switched carriers to Canada in 2005.

61. Richard Lane, former TA executive, testified that TA's rates charged to SC Johnson were higher than rates charged to other customers on similar lanes.

62. Kent Rigdon, another former TA executive, testified that SC Johnson was at or near the top of TA customers on a revenue-per-mile basis.

63. Far Side's revenues from SC Johnson increased from approximately $50,000 in 1999 to $2.5 million in 2004.

64. Far Side's only substantial customer was SC Johnson.

65. Far Side was awarded over-the-road business on routes where intermodal should have been used.

66. While Far Side consistently had the worst service of all of SC Johnson's carriers, Morris refused to terminate Far Side, despite the urging of Morris's subordinates.

67. In addition to increased business and favorable rates, Morris provided other favorable treatment to Defendants and Far Side. On one occasion, Morris reprimanded a subordinate in the Transportation Department for attempting to convince Stevens to abide by an agreement between the parties that entitled SC Johnson to a $10,000 discount.

### III. DAMAGES INCURRED BY SC JOHNSON AS A RESULT OF MORRIS AND DEFENDANTS' SCHEMES

68. SC Johnson has been damaged by Defendants' bribery scheme.

69. SC Johnson annually paid Defendants millions of dollars over and above reasonable market rates for the services provided and costs incurred.

70. Payment of higher transportation rates has rendered SC Johnson's products less competitive in the marketplace, eroding its competitive standing and potentially harming sales.

### COUNT I: CIVIL CONSPIRACY TO VIOLATE WISCONSIN STATUTE § 134.05
### Against All Defendants

71. SC Johnson realleges as if fully set forth the allegations set forth in the preceding paragraphs of its complaint.

72. Stevens, TA, and Pharr each formed a separate conspiracy with Morris through which they sought to cause SC Johnson to pay Stevens, TA, and Far Side rates substantially above those available in the market and to cause SC Johnson to award them business.

73. As alleged above, in furtherance of the conspiracies, Defendants provided Morris with bribes (including but not limited to those detailed in paragraphs 21 through 49) in exchange with the intent to influence Morris in the conduct of business on behalf of SC Johnson, and the cash, gifts, and other items of value given to Morris did, in fact, influence his conduct of SC

Johnson's business to SC Johnson's detriment. In exchange for bribes, Stevens, TA and Far Side received rates that exceeded competitive levels and for reimbursement above costs incurred or charges that exceeded industry standards.

74. Upon information and belief, the conspiracies between Morris and the Defendants were ongoing for several years, and likely longer.

75. The bribes paid by Defendants to Morris violate Wisconsin Statutes § 134.05.

76. As described above, SC Johnson was damaged as a result of the wrongful acts committed by Defendants.

### COUNT II: WISCONSIN ORGANIZED CRIME CONTROL ACT
### Against All Defendants

77. SC Johnson realleges as if fully set forth the allegations set forth in the preceding paragraphs of its complaint.

78. Plaintiff is a "person" within the meaning of Wisconsin Statutes § 946.87(4).

79. SC Johnson and SC Johnson's Transportation Department are "enterprises" within the meaning of Wisconsin Statutes § 946.82(2).

80. SC Johnson and SC Johnson's Transportation Department were and are legitimate organizations. SC Johnson is a corporation organized under the laws of the State of Wisconsin. SC Johnson's Transportation Department is an organization within SC Johnson with a defined hierarchical structure and the legitimate goal of providing transportation and shipping services to SC Johnson.

81. Morris was an employee of SC Johnson and of SC Johnson's Transportation Department and was a managing agent of SC Johnson.

82. Defendants were associated with the Transportation Department as carriers providing transportation services to SC Johnson.

83. Defendants conducted and participated in the activities of SC Johnson and SC Johnson's Transportation Department. Defendants directed SC Johnson and SC Johnson's Transportation Department to pay above-market rates and for services that were not necessary through submission of numerous invoices to SC Johnson and to award Stevens, TA and Far Side business. Defendants also provided bribes to Morris in order to direct and influence the conduct of the business of SC Johnson and SC Johnson's Transportation Department.

84. Defendants paid Morris and/or Scheller bribes and kickbacks on many occasions, including but not limited to the bribes described in paragraphs 211 through 49.

85. Each bribe paid by Defendants and received by Morris violates Wisconsin Statutes § 134.05 and, therefore, constitutes "racketeering activity" within the meaning of Wisconsin Statutes § 946.82(4).

86. Defendants have provided cash, gratuities, and gifts, intended as bribes, to Morris on far more than three occasions within a several-year period.

87. The bribes paid by Defendants to Morris, and Morris's actions in causing SC Johnson to pay Stevens, TA and Far Side transportation rates in excess of rates available on the open market; to pay them for services not performed and costs not incurred; to pay them charges invoiced at levels well above industry standards; and, in some cases, to award an increasing amount of its shipping business to them were part of a common plan designed to injure SC Johnson and benefit the defendants.

88. Defendants' payment of bribes constitute a "pattern of racketeering activity" within the meaning of Wisconsin Statutes § 946.82(3).

89. The bribes paid by Defendants were related and continuous, spanned a period of at least several years, and were intended to direct SC Johnson to pay Stevens, TA and Far Side

transportation rates in excess of rates available on the open market, to pay Stevens, TA and Far Side charges invoiced at levels well above industry standards, and to award business to Stevens, TA and Far Side.

90. In addition, Defendants submitted numerous invoices over the course of their multi-year relationships with SC Johnson. Some, if not all, of those invoices contained above-market rates that were the product of Defendants' bribery schemes.

91. Each fraudulent invoice submitted by Defendants violates Wisconsin Statutes § 943.89 (state mail fraud), 18 U.S.C. § 1841 (federal mail fraud), Wis. Stat. § 943.90 (state wire fraud) and/or 18 U.S.C. § 1843 (federal mail fraud) and, therefore, constitutes "racketeering activity" within the meaning of Wisconsin Statutes § 946.82(4).

92. Defendants submitted fraudulent invoices on far more than three occasions within a several-year period. The fraudulent invoices were related and continuous, and caused SC Johnson to pay Defendants transportation rates in excess of rates available on the open market, to pay Defendants charges invoiced at levels well above industry standards, and to award business to Defendants.

93. Defendants' submission of multiple fraudulent invoices constitute a "pattern of racketeering activity" within the meaning of Wisconsin Statutes § 946.82(3).

94. In addition, Stevens, TA, and Pharr each formed a separate conspiracy with Morris through which they sought to cause SC Johnson to pay Stevens, TA, and Far Side rates substantially above those available in the market and to reimburse them for costs not actually incurred.

95. In furtherance and as a part of each of these conspiracies, Morris intentionally transferred SC Johnson's money, over which he had control by virtue of his employment with SC

Johnson, to Stevens, TA and Far Side for services not performed, without SC Johnson's consent, contrary to the scope of Morris' authority and with intent to convert the money to Defendants.

96. Each such conspiracy to transfer money for services not provided violates Wis. Stat. § 943.20(b) and, therefore, constitutes "racketeering activity" within the meaning of Wisconsin Statutes § 946.82(4).

97. Defendants conspired with Morris on more than three occasions to transfer SC Johnson's money to Stevens, TA and Far Side for services not performed in violation within a seven-year period such that they constitute a "pattern of racketeering activity" within the meaning of Wisconsin Statutes § 946.82(3).

98. Defendants have conducted and participated in the enterprise of SC Johnson and SC Johnson's Transportation Department through the pattern of racketeering activity described above.

99. Defendants intended to benefit themselves and harm SC Johnson through their pattern of racketeering activity. Defendants' actions benefited Defendants by causing SC Johnson to pay Stevens, TA and Far Side transportation rates in excess of rates available on the open market; to pay them for services that were not necessary; to pay them charges invoiced at levels well above industry standards; and, in some cases, to award shipping business, such as new routes, to them.

100. SC Johnson was damaged by Defendants' actions because it paid Stevens, TA and Far Side rates in excess of rates available on the open market, paid them for services that were not necessary, and awarded shipping business to them.

101. Defendants' actions caused damages to SC Johnson on repeated occasions. SC Johnson was damaged each time it paid Stevens, TA and Far Side rates in excess of rates

available on the open market, paid them for charges that exceeded industry standards, and awarded shipping business to them.

102. Defendants' acts entitle SC Johnson to relief under Wisconsin Statute § 946.87(4).

WHEREFORE, SC Johnson prays that the Court enter judgment in favor of SC Johnson and against Defendants as follows:

    A.    For damages sustained by SC Johnson as a result of Defendants' actions in an amount to be proven at trial;

    B.    For damages in an amount equal to twice the amount of damages proven at trial, pursuant to Wisconsin Statutes § 946.87(4);

    C.    For punitive damages;

    D.    For attorney fees and costs of investigation and litigation pursuant to Wisconsin Statutes § 946.87; and

    E.    Such other relief deemed appropriate and just by the Court.

Dated this 31st day of December, 2012.

    BY s\Rebecca F. Kennedy
    Attorneys for Plaintiff,
    S.C. Johnson & Son, Inc.

| | |
|---|---|
| Reinhart Boerner Van Deuren s.c. | Mark A. Cameli |
| 1000 North Water Street, Suite 1700 | WI State Bar ID No. 1012040 |
| Milwaukee, WI 53202 | Sarah A. Huck |
| 414-298-1000 | WI State Bar ID No. 1036691 |
| | Rebecca F. Kennedy |
| | WI State Bar ID No. 1047201 |
| Mailing Address: | mcameli@reinhartlaw.com |
| P.O. Box 2965 | shuck@reinhartlaw.com |
| Milwaukee, WI 53201-2965 | rkennedy@reinhartlaw.com |
| | |
| | Jeffrey Willian, P.C. |
| | Donna M. Welch, P.C. |
| | Sarah J. Donnell |
| | Kirkland & Ellis LLP |
| | 300 N. LaSalle |
| | Chicago, IL 60654 |

(312) 862-2000
(312) 862-2200 (facsimile)
jeffrey.willian@kirkland.com
donna.welch@kirkland.com
sarah.donnell@kirkland.com

REINHART\9295605